**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

Case No.  14-30843

SHIVSHANKAR PARTNERSHIP LLC

Debtor

**MEMORANDUM ON MOTION OF TENNESSEE STATE BANK
FOR RELIEF FROM THE AUTOMATIC STAY AND
AMENDED FIRST APPLICATION FOR INTERIM COMPENSATION**

**APPEARANCES:**    TARPY, COX, FLEISHMAN & LEVEILLE, PLLC
T. Lynn Tarpy, Esq.
Thomas M. Leveille, Esq.
1111 Northshore Drive
Suite N-290
Knoxville, Tennessee  37919
Attorneys for Debtor

GENTRY, TIPTON & MCLEMORE, P.C.
Maurice K. Guinn, Esq.
Post Office Box 1990
Knoxville, Tennessee  37901-1990
Attorneys for Tennessee State Bank

SAMUEL K. CROCKER, ESQ.
UNITED STATES TRUSTEE
Kimberly S. Swafford, Esq.
31 East 11th Street
Fourth Floor
Chattanooga, Tennessee 37402
Attorneys for United States Trustee

**RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE**

These contested matters are before the court upon (1) the Motion of Tennessee State Bank for Relief from the Automatic Stay (Motion for Stay Relief) filed by Tennessee State Bank on July 11, 2014, seeking relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1), (2), and/or (3) (2006); and (2) the Amended First Application for Interim Compensation (Amended Fee Application) filed by the Debtor's attorneys, Lynn Tarpy and Tarpy, Cox, Fleishman & Leveille, PLLC, on July 22, 2014, asking the court for an award of interim compensation in the amount of $13,185.00 to be paid from a $20,000.00 retainer paid to the attorneys by the Debtor out of Tennessee State Bank's cash collateral. The evidentiary hearing was held on September 10, 2014. The record before the court consists of Stipulations filed by the parties on September 4, 2014, as supplemented by the Supplement to Stipulations filed after the trial concluded, twenty-four exhibits stipulated into evidence, and the testimony of four witnesses: Todd Flanders, Anil Merai, Shelly Spurgeon, and Tarun Surti.

This is a core proceeding. 28 U.S.C. § 157(b)(2)(G) and (M) (2006).

# I

The Debtor owns real property and improvements known as the Comfort Inn located at 140 Cusick Road, Alcoa, Tennessee. It filed the Voluntary Petition commencing its Chapter 11 case on March 17, 2014, and continues to operate as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 (2006). On May 29, 2014, the court entered an Order determining that the Debtor is subject to the single asset real estate provisions of 11 U.S.C. § 362(d)(3). Tennessee State Bank is a creditor of the Debtor by virtue of (1) a January 20, 2011 Promissory Note in the principal amount of $2,658,256.71 which is secured by the Comfort Inn, including the real property, all

2

furniture, fixtures, and equipment (collectively, Comfort Inn); and (2) an April 24, 2012 Note in the principal amount of $200,000.00, which is secured by a second deed of trust encumbering the Comfort Inn.  On April 3, 2014, Tennessee State Bank filed proofs of claim in the amounts of $2,726,986.50 and $200,089.80, respectively, representing the balances due under the Notes as of the petition date.  TRIAL EX. 1; TRIAL EX. 2.  The Debtor last made payment to Tennessee State Bank on January 31, 2014, representing the December 2013 installments, after which Tennessee State Bank called the Notes in default, as set forth in its letter dated February 3, 2014, and initiated foreclosure proceedings.  TRIAL EX. 4.  Foreclosure was scheduled for March 18, 2014, but was stayed by the filing of the Debtor's bankruptcy case.

The Order Granting Motion to Shivshankar Partnership, LLC to Approve the Use of Cash Collateral was entered on April 7, 2014, under the terms of which the Debtor was authorized to use revenues from the operation of the Comfort Inn and agreed to grant Tennessee State Bank a replacement lien and security interest together with an additional post-petition lien and security interest.  TRIAL EX. 5.  The Debtor also agreed to pay a $7,000.00 monthly adequate protection payment to Tennessee State Bank.  On June 10, 2014, the court entered its final Order Granting Motion to Shivshankar Partnership, LLC to Approve the Use of Cash Collateral (Cash Collateral Order), setting forth the same terms as the original.

Tennessee State Bank filed its Motion for Stay Relief on July 11, 2014, arguing that it is not adequately protected, that there is no reasonable likelihood that the Plan of Reorganization proposed on June 26, 2014, can be confirmed in a reasonable time, and that the proposed treatment of Tennessee State Bank's claims is not fair and equitable.  TRIAL EX. 6.  The Debtor filed its Reply

to Motion for Relief from the Automatic Stay Filed by Tennessee State Bank on August 6, 2014,

arguing that the Comfort Inn is necessary for an effective reorganization, that the Plan of

Reorganization is fair and equitable, and that it is likely to be approved by at least one class of

impaired creditors.    TRIAL EX. 7.    Subsequently, the Debtor filed an Amended Plan of

Reorganization on August 29, 2014.    TRIAL EX. 12.    In its Amended Plan of Reorganization, the

Debtor proposes payment to Tennessee State Bank on its allowed secured claims in the aggregate

amount of $2,927,076.30 plus 5.25% interest as follows: monthly installment payments of

$12,805.96 between September 1, 2014, and September 1, 2015, increasing to $16,163.42 from

October 1, 2015 through September 1, 2019, with a balloon payment of the balance due on

November 1, 2019.  TRIAL EX. 12 at 2-3.  Tennessee State Bank will retain its lien, and the balloon

payment will be funded through a refinancing of the debt presently encumbering the Comfort Inn.

TRIAL EX. 12 at 2-3.    As stated in the pretrial Order entered on August 8, 2014, the issue to be

resolved by the court with respect to the Motion for Stay Relief is whether Tennessee State Bank is

entitled to relief from the automatic stay for cause under 11 U.S.C. § 362(d)(1), and/or pursuant to

11 U.S.C. § 362(d)(2) and/or (3).

On July 22, 2014, the Debtor's attorneys filed their Amended Fee Application, asking for

compensation in the amount of $13,185.00 with payment to be made from a $20,000.00 retainer paid

by the Debtor and held in the attorneys' trust account.  Tennessee State Bank filed its Response of

Tennessee State Bank to Amended First Application for Interim Compensation on August 20, 2014,

objecting to payment of the fees from the retainer if the retainer was derived from rents and revenues

from the Comfort Inn; i.e., cash collateral.  Pursuant to the pretrial Order entered on August 28,

2014, the court is to resolve whether the $20,000.00 retainer held in the Debtor's attorneys' trust

4

account represents cash collateral of Tennessee State Bank and, if so, whether Tennessee State

Bank's interest in the cash collateral is adequately protected by an equity cushion, or otherwise, thus

permitting payment of the requested attorney fee to the Debtor's attorneys.

## II

The automatic stay provides debtors with "an opportunity to protect [their] assets for a period

of time so that [their] resources might be marshaled to satisfy outstanding obligations[;]" *Laguna

Assocs. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship)*, 30 F.3d 734, 737

(6th Cir. 1994), however, because creditors "should not be deprived of the benefit of their bargain"

during the pendency of the automatic stay, they may seek relief from the automatic stay. *In re

Planned Sys., Inc.*, 78 B.R. 852, 860 (Bankr. E.D. Ohio 1987). Motions for relief from the stay are

governed by 11 U.S.C. § 362(d), which provides, in material part:

> (d)  On request of a party in interest and after notice and a hearing, the court shall
> grant relief from the stay provided under subsection (a) of this section, such as by
> terminating, annulling, modifying, or conditioning such stay —
>
> > (1) for cause, including the lack of adequate protection of an interest in
> > property of such party in interest; [or]
> >
> > (2) with respect to a stay of an act against property under subsection (a) of
> > this section, if –
> >
> > > (A) the debtor does not have an equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization;
> >
> > (3) with respect to a stay of an act against single asset real estate under
> > subsection (a), by a creditor whose claim is secured by an interest in such real
> > estate, unless, not later than the date that is 90 days after the entry of the order
> > for relief (or such later date as the court may determine for cause by order
> > entered within that 90-day period) or 30 days after the court determines that
> > the debtor is subject to this paragraph, whichever is later –

5

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments that –

(i) may, in the debtor's sole discretion, notwithstanding section 362(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate[.]

11 U.S.C. § 362(d).

## A

Tennessee State Bank first seeks relief from the stay under subsection (d)(1) "for cause." "There is no definition of the term 'cause' as used in section 362(d)(1). The determination whether cause exists to lift the stay is a fact-intensive inquiry made on a case-by-case basis." *In re SSK Partners LLC*, 2012 WL 4929019, at *3, 2012 Bankr. LEXIS 4896, at *7 (Bankr. N.D. Ill. Oct. 12, 2012) (citations omitted). Tennessee State Bank argues that because the Debtor has used its cash collateral without permission, including payment of the $20,000.00 retainer paid to its attorneys, has not maintained its real property taxes, and has not maintained the Comfort Inn, Tennessee State Bank's interest in its collateral is not being adequately protected.

"Adequate protection comes in a variety of forms, including periodic payments, additional or replacement liens, and other relief that provides the 'indubitable equivalent' to the protections

afforded to the creditor outside of bankruptcy." *In re Biltwood Props. LLC*, 473 B.R. 70, 74 (Bankr. M.D. Pa. 2012) (citing among other authority 11 U.S.C. § 361 (2006)).  In addition to the statutory forms found in § 361, adequate protection may also be accomplished through the existence of an equity cushion, or "'value in the property, above the amount owed to the secured creditors . . . that will shield that interest from loss due to a decrease in the property's value during the time the automatic stay remains in effect.'" *In re Norton*, 347 B.R. 291, 298 (Bankr. E.D. Tenn. 2006) (quoting *Sumitomo Trust & Banking Co. v. Holly's Inc. (In re Holly's Inc.)*, 140 B.R. 643, 697 n.87 (Bankr. W.D. Mich. 1992)) (brackets omitted).  "With respect to § 362(d)(1), the purpose of providing adequate protection is to insure that a creditor receives the value for which it bargained pre-bankruptcy." *In re DB Capital Holdings, LLC*, 454 B.R. 804, 816-17 (Bankr. D. Col. 2011). A creditor may be entitled to relief from the stay "if there is insufficient equity in the property to adequately protect the creditor[;]" *Martens v. Countrywide Home Loans (In re Martens)*, 331 B.R. 395, 398 (B.A.P. 8th Cir. 2005); however, "[w]hile an equity cushion is generally considered prima facie evidence of adequate protection, the absence of an equity cushion does not establish the converse . . . .  The concept of adequate protection was not designed or intended to place an undersecured or minimally secured creditor in a better post-filing [position] that it was in before the stay." *Planned Sys., Inc.*, 78 B.R. at 862 (citations omitted).

> The determination of whether a creditor's interest is adequately protected is not an exact science nor does it involve a precise arithmetic computation.  Rather, it is pragmatic and synthetic, requiring a court to balance all relevant factors in a particular case, including the value of the collateral, whether the collateral is likely to depreciate over time, the debtor's prospects for a successful reorganization and the debtor's performance under the plan.  Other considerations may include the balancing of hardships between the parties and whether the creditor's property interest is being unduly jeopardized.  A secured creditor retains the right to adequate protection of its collateral, which means it is entitled to have the value of its collateral maintained at

all times, and it can obtain relief from the automatic stay and take back its collateral at any time if that interest is not adequately protected or for other cause.

*In re Bushee*, 319 B.R. 542, 551-52 (Bankr. E.D. Tenn. 2004) (internal citations and quotation marks omitted).

As an initial matter, the parties have stipulated that there is no equity cushion, and Tennessee State Bank is undersecured because the amount of its claims – $2,927,076.30 at the time of the bankruptcy filing – plus the unpaid property taxes to Blount County and the City of Alcoa totaling more than $200,000.00 exceeds the most recent appraisal of $2,500,000.00 for the Comfort Inn as of September 2, 2014. The Debtor nevertheless argues that Tennessee State Bank is adequately protected because the real property is not declining in value and that even though there is no equity in the Comfort Inn, it is working with a new management consultant to reduce expenses and increase efficiency and has begun making repairs and renovation to the hotel post-petition in order to improve its business operations. The value of the property, argues the Debtor, is not declining as is reflected by the fact that the September 2, 2014 appraisal values the Comfort Inn at $2,500,000.00, the same value it was given as of February 25, 2014. The Debtor also argues that, under the terms of its Amended Plan of Reorganization, it will make interest-only payments to Tennessee State Bank for the next year which will increase in October 2015, and it will be paying its past due real estate taxes, both of which will increase Tennessee State Bank's adequate protection.

Tennessee State Bank, however, argues the opposite, relying in large part on the February 2, 2014 appraisal by Woodford & Associates assigning a value for the property that is $1,250,000.00 less than a February 2013 appraisal of the same property also conducted by Woodford & Associates, which valued the Comfort Inn at that time at $3,750,000.00. *Compare* TRIAL EX. 16 *with* TRIAL

EX. 15. Tennessee State Bank also argues that the Debtor's revenues are declining based upon the Debtor's 2012 Profit & Loss Statement which reflects Lodging Sales of $1,018,448.83, the Debtor's 2012 Form 1065 U.S. Return of Partnership Income which reflects "gross receipts or sales" in the amount of $915,598.00, and the Debtor's Profit & Loss Statement for 2014 reflecting total income of $593,532.95 through August 17, 2014. TRIAL EX. 8; TRIAL EX. 9; TRIAL EX. 10.

With respect to the value of the Comfort Inn, Todd Flanders, the certified appraiser who conducted both the February 2013 and the February 2014 appraisals, as well as the most recent September 2, 2014 appraisal, testified that the February 2013 appraisal, assigning a $3,750,000.00 value to the property, was an update to an appraisal originally made in January 2012, but that he did not actually visit the Comfort Inn in February 2013. *See* TRIAL EX. 15. Instead, the $3,750,000.00 value reflected in the February 2013 appraisal report was based upon the following:

> The client has requested the subject be valued based on profit/loss statements provided to the appraiser, as well as the Sales Comparison Approach. The client provided a profit/loss statement for 2012 and the appraiser (due to previous work performed for the client on this property) had profit/loss statements covering 2003 through 2011.

> While no inspection was made on the property, an extraordinary assumption is made assuming the property to be in the same condition as when inspected by the appraisers for this client in January 2012. . . . Should the contrary be found, the appraiser reserves the right to review and alter, if necessary, any and all value conclusions contained herein.

TRIAL EX. 15 at 5. Conversely, with respect to the February and September 2014 appraisals, Mr. Flanders testified that he visited the Comfort Inn as well as reviewed the Debtor's actual financial records, and that the large reduction in value between February 2013 and February 2014 is based upon the Debtor's declining revenues while its expenses have remained fairly stable. TRIAL EX. 16; TRIAL EX. 17.

With respect to the cost approach, Mr. Flanders determined that the Comfort Inn had an effective age of 16 years and an economic life of 45 years, yielding depreciation estimated at 36%, assigned a land value conclusion of $305,000.00 and valued the property with improvements at $2,175,000.00. TRIAL EX. 17 at 59, 61, 64. Utilizing the sales comparison approach, Mr. Flanders compared seven similar properties and, based upon those properties' net operating income and effective gross income multipliers, arrived at a value for the Comfort Inn of $2,750,000.00. TRIAL EX. 17 at 80-81. Mr. Flanders's testimony concerning value, however, focused primarily upon the income approach for which he found a value of $2,100,000.00. TRIAL EX. 17 at 88. As reflected in the tables on pages 83 and 84 of the September 2, 2014 appraisal, the Debtor's total effective gross income compared to total expenses since 2003 has been as follows: income of $991,986.00 and expenses of $588,854.00 in 2003, income of $924,524.00 and expenses of $640,371.00 in 2004, income of $1,018,782.00 and expenses of $696,752.00 in 2005, income of $1,087,212.00 and expenses of $651,074.00 in 2006, income of $1,010,857.00 and expenses of $715,068.00 in 2007, income of $1,045,600.00 with no data of total expenses in 2008, income of $847,681.00 with no data of total expenses in 2009, income of $884,135.00 and expenses of $718,036.00 in 2010, income of $1,021,841.00 and expenses of $788,681.00 in 2011, income of $1,018,499.00 and expenses of $744,448.00 in 2012, income of $927,884.00 and expenses of $742,797.00 in 2013, and a projected income of $946,024.00 and expenses of $664,312.00 in 2014 based upon annualized revenues and expenses through August 17, 2014. TRIAL EX. 17 at 83-84. Mr. Flanders estimated an effective gross income of $15,750.00 per room, which rounds to $930,000.00, and an average room expense of $12,500.00 per room, which rounds to $740,000.00 for the 59 rooms, yielding, in his opinion, net income of $190,000.00 or $3,220.00 per room. TRIAL EX. 17 at 83-84. Based upon the decreases

10

in hotel revenues since 2012, Mr. Flanders testified on direct examination that he believed the value of the Comfort Inn to be declining; however, he also testified on cross-examination that the value of the property did not decline between February and September 2014, and that the $3,750,000.00 value assigned in February 2013 would have been lower if it had been based upon the Debtor's actual revenues. In sum, Mr. Flanders testified that the value of this hotel property is dependent upon its revenues.

As for the hotel building, Mr. Flanders rated it, in his appraisal report, as "average" although he testified that the masonry construction quality is superior to those with wood frames. TRIAL EX. 17 at 8. He testified that the exterior of the Comfort Inn, which is adjacent to several "newer" looking hotels – the LaQuinta Inn, the Country Inn & Suites, and Candlewood Suites – had needed updating, and the older looking exterior could have been a factor in the Debtor's declining revenues, just as the Debtor's recent efforts to update by painting the exterior to make the property more visually appealing could be a factor leading to increased revenues. With respect to the hotel's interior, his report reflects that it needs to be updated as well, such as painting, new carpeting, and new light fixtures. TRIAL EX. 17 at 8. This testimony was confirmed through photographs showing wear and tear on chairs in the hotel rooms, areas in need of repair in the maintenance and pool areas, and water damage spotting on the ceiling in some areas. COLL. TRIAL EX. 18. Mr. Flanders also testified that the market as a whole in Blount County is good, with a general trend towards stability, and there is no new development on Alcoa Highway.

Based upon the record, although the court finds that the value of the Comfort Inn may not be decreasing in value based upon the most recent appraisals, the declining value of collateral is only

11

one of the factors to be examined in making the determination whether to grant relief from the automatic stay for cause under § 362(d)(1). The Debtor has, as required by the Cash Collateral Order, made monthly payments to Tennessee State Bank of $7,000.00 of which $3,000.00 is to pay the interest accruing on the past due real property taxes with the $4,000.00 balance to be escrowed and used for payment of the 2014 taxes. The Debtor has also made one interest-only payment to Tennessee State Bank of $12,805.96, the amount provided for in the Amended Plan of Reorganization, which Tennessee State Bank refused to accept. This payment remains in escrow in the Debtor's attorneys' trust account. As discussed, Mr. Flanders testified that the value of the Comfort Inn has not decreased between February and September 2014, and that the total revenues for July and August 2014 have increased from the total revenues for the same months in 2013, as reflected in Trial Exhibit 14; however, he also testified that, in his opinion, the value of the property is decreasing based upon revenues. There was also evidence in the form of photographs, *see* COLL. TRIAL EX. 18, and the testimony of Mr. Merai establishing that the hotel building has not been maintained as it should have been, and although both Mr. Flanders and Mr. Merai testified that the Debtor has recently painted the exterior of the hotel to make it look more appealing, has updated the bedding and televisions in the rooms, and is in the process of updating the marketplace area in the lobby, there are numerous areas, including the pool, that still require substantial work for which the Debtor does not have the funds at this time. Furthermore, the Debtor was required to update the bedding and televisions in order to maintain its franchise with Choice Hotels International, Inc., and it used cash collateral of Tennessee State Bank without obtaining permission or providing for such improvements in the budgets provided to Tennessee State Bank. Accordingly, the court finds cause to grant the Motion for Stay Relief pursuant to § 362(d)(1).

12

**B**

With respect to § 362(d)(2),Tennessee State Bank argues that there is no equity in the Comfort Inn and that it is not necessary for the Debtor's effective reorganization.  Because the parties have stipulated that there is no equity, the Debtor bears the burden of proof to satisfy the § 362(d)(2)(B) element by establishing that it is attempting to reorganize within a reasonable time, that reorganization is feasible, and that the Comfort Inn is necessary for its reorganization.  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 375-76, 108 S. Ct. 626, 633, 98 L.Ed.2d 740 (1988).

> "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, [the] property will be needed for it; but that the property is essential for an effective reorganization that is in prospect."  If evidence indicates that a successful reorganization within a reasonable time is impossible, the court must then grant relief from the automatic stay. . . .  [T]he use of the 'sliding scale' burden of proof is intended to benefit debtors who have a realistic chance of reorganization but who have not had sufficient time to formulate a confirmable plan. . . .  "[A] debtor must demonstrate that a successful reorganization within a reasonable time is 'probable.'"

*In re Rocky Mountain Land Co. LLC*, 2014 WL 1338292, at *3-4, 2014 Bankr. LEXIS 1370, at *11-12 (Bankr. D. Col. Apr. 3, 2014) (quoting *Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. at 376 and *In re Gunnison Ctr. Apartments, LP*, 320 B.R. 391, 402 (Bankr. D. Col. 2005)).  The burden of proof is fact-intensive and less stringent in the early stages of the bankruptcy case, and "a secured creditor may be expected to bear some reasonable delay while the debtor is moving meaningfully to propose a plan."  *Holly's, Inc.*, 140 B.R. at 699-701 (holding that a plan may be "somewhat obscure or vague as long as it is plausible that a successful reorganization may occur.").

It is undisputed that the Debtor's revenues are derived solely from its operation of its business, and the Comfort Inn is necessary for the Debtor to effectively reorganize. Likewise, there is no dispute that the Debtor filed an Amended Plan of Reorganization on August 29, 2014, that proposes to pay Tennessee State Bank monthly interest payments of $12,805.96 between September 1, 2014, and September 1, 2015, monthly interest and principal payments of $16,163.42 from October 1, 2015 through September 1, 2019, and a balloon payment of the balance on November 1, 2019. Accordingly, the issue with respect to stay relief pursuant to subsection (d)(2) is whether the Debtor's attempts to reorganize through the Amended Plan of Reorganization are feasible. Tennessee State Bank argues that the Debtor cannot effectively reorganize because its figures reflect a projected loss for 2014 and do not actually support the proposed payments to creditors in the Amended Plan of Reorganization. In support of this argument, Tennessee State Bank relies on the figures in the Profit/Loss Statement for 2011 through 2014, which reflect net income of $57,339.34 for 2011, $9,192.67 for 2012, and $19,981.75 for 2013. TRIAL EX. 8; TRIAL EX. 10; COLL. TRIAL EX. 13 at Ex. 3. Tennessee State Bank also offered into evidence the following breakdown of the monthly projected revenues compared to the Debtor's actual revenues: for January, actual revenues of $53,608.00 were $1,192.00 below the $54,800.00 projection, for February, actual revenues of $52,000.00 were $3,792.00 below the $55,792.00 projection, for March, actual revenues of $65,582.00 were $10,924.00 below the $76,506.00 projection, for April, actual revenues of $85,428.00 were $7,091.00 above the $78,337.00 projection, for May, actual revenues of $101,322.00 were $12,439.00 below the $113,761.00 projection, for June, actual revenues of $90,546.00 were $8,749.00 below the $99,295.00 projection, for July, actual revenues of $101,834.00 were $10,358.00 above the $91,476.00 projection, and for August, actual revenues of

14

$76,185.00 were $10,260.00 below the $86,445.00 projection, yielding, as of the end of August, actual revenues that are $29,907.00 below the Debtor's projections for 2014. TRIAL EX. 19. Additionally, as acknowledged by Mr. Merai, none of these include any debt service payments to Tennessee State Bank.

The Debtor, on the other hand, argues that its current revenues can, in fact, support the proposed plan payments, that it has cut expenses and is showing increased revenues from 2013, and it is making improvements and marketing the Comfort Inn in order to continue raising revenues. As stated in and attached to the Debtor's First Amended Disclosure Statement filed on September 2, 2014, the Debtor bases its proposed plan payments and treatments for creditors on figures found in its monthly operating reports, its Profit/Loss Statement for 2011 to 2013, and a 2014 Pro Forma Projection, COLL. TRIAL EX. 13 at Ex. 1, Ex. 3, Ex. 4, as well as the Profit/Loss Statement for January 1 through August 17, 2014. TRIAL EX. 10. The Profit/Loss Statement for 2011 through 2013 reflects total income in the amount of $1,052,781.00 less total expenses of $995,441.46 for a net income of $57,339.54 for 2011, total income in the amount of $1,018,449.63 less total expenses of $1,009,256.96 for a net income of $9,192.67 for 2012, and total income of $927,884.31 less total expenses of $907,902.56 for a net income of $19,981.75 for 2013. COLL. TRIAL EX. 13 at Ex. 3. The Profit/Loss Statement for January 1 through August 17, 2014 reflects total income of $593,532.95 less total expenses of $278,826.17 and total "other expenses" of $21,219.56 for a net income of $140,602.53. TRIAL EX. 10. Finally, the Pro Forma reflects operating income of $80,630.00 for 2014, $67,957.00 for 2015, $66,169.00 for 2016, $124,251.00 for 2017, $148,429.00 for 2018, and $173,993.00 for 2019. COLL. TRIAL EX. 13 at Ex. 4.

15

In additional support of its steps to reorganize, the Debtor offered the testimony of Tarun Surti, an experienced businessman, who has taken on management of the Debtor's financials. Mr. Surti testified that he prepared the Pro Forma and the 2014 Profit/Loss Statement and that he has focused on raising revenues and cutting expenses, including trimming payroll, and making improvements in order to retain the Choice Hotels International, Inc. franchise.  He testified that in an effort to attract more patrons, the Debtor has begun painting the exterior, changing out the bedding and televisions in the rooms, advertising at the airport and offering shuttle service, increased its internet presence by paying for an agreement with Expedia to promote the hotel, and been paying closer attention to customer comments and recommendations.  Mr. Surti testified that there are also plans to change the colors and carpet in the lobby, to fix the pool, to get newer exercise equipment, to change bathroom fixtures and showerheads, and to update the individual rooms.  Additionally, Mr. Surti testified that the Debtor can pay its real property taxes moving forward, as evidenced by the fact that it has been making its required monthly installments for taxes into escrow, that it has paid all payroll taxes, and that it has money available and ready to pay to Tennessee State Bank in accordance with its proposed Amended Plan of Reorganization, as reflected in Trial Exhibit 22, which shows the Debtor with bank balances, as of September 10, 2014, totaling $92,205.94, including $38,500.00 in escrow for property taxes.  Mr. Surti also testified that he is personally willing to advance interest payments to Tennessee State Bank if necessary.

Although there may be some uncertainty concerning whether the Debtor's Amended Plan of Reorganization can be confirmed as proposed, the Debtor is an ongoing business with actual revenue, and it is entitled to an opportunity to go through the confirmation process.  Unquestionably, the Debtor's revenues have been inconsistent over the past few years; however, even though

Tennessee State Bank and Mr. Flanders down-played it as a serious factor, the court believes that the economic problems experienced in this country for the last several years must be considered, and although the market is stabilizing, it has been anything but stable for the last several years. Additionally, as acknowledged by Mr. Merai and Mr. Surti, the Comfort Inn has been in need of updating, the expenses have been too high, and the revenues have been too low, all of which has contributed to the problems and the need for reorganization. The Debtor is, through Mr. Surti's assistance, taking positive steps to increase its cash flow, and although it has been required to expend money in order to make repairs and updates to the hotel property, these expenditures were necessary to retain the Choice Hotels International, Inc. flag under the franchise agreement and to also attract more business. The Debtor has shown an increase in revenues for July and August 2014 above those for the same months in 2013, and, as acknowledged by Mr. Flanders, because of the Great Smoky Mountains and Tennessee football, among other draws, fall is a busy season for the hotel industry in this area. In sum, the Debtor deserves the opportunity to try and maximize its revenues during that time. The Debtor has also filed a disclosure statement that was determined by the court to be adequate and has begun the balloting process for its Amended Plan of Reorganization. For these reasons, the court will not grant Tennessee State Bank relief from the automatic stay pursuant to § 362(d)(2). The court also finds that Tennessee State Bank's argument that the proposed interest only payments to it are not sufficient and the proposed 5.25% interest rate is not acceptable are not issues to be determined at this juncture and should be addressed in the normal course of confirmation. Likewise, Tennessee State Bank's argument that it is entitled to stay relief under § 362(d)(3) – which applies exclusively to single asset real estate debtors – is also inappropriate at

17

this time because the Debtor has, in fact, proposed a plan of reorganization that has the potential of being confirmed.

**C**

Nevertheless, because the court has determined that cause exists under § 362(d)(1), the Motion of Tennessee State Bank for Relief from the Automatic Stay filed on July 11, 2014, will be granted. "The court has discretion, however, to condition the automatic stay instead of lifting it outright[,]" *In re Ivens Props., Inc.*, 2013 WL 5934654, at *2, 2013 Bankr. LEXIS 4550, at *6 (Bankr. E.D. Tenn. Oct. 31, 2013), and the stay will be conditioned on the following:

(1) The Debtor must obtain confirmation of its Amended Plan of Reorganization – or any subsequently filed amendment thereto – by March 31, 2015. Setting a deadline by which the Debtor must obtain confirmation of a plan, absent which termination of the stay will be granted, protects Tennessee State Bank while still allowing the Debtor an opportunity to try and reorganize. *See, e.g., In re Trigee Foundation, Inc.*, 2013 WL 1401889, at *4, 2013 Bankr. LEXIS 1432, at *11 (Bankr. D. Col. Apr. 8, 2013). In the event the Debtor has not obtained confirmation by March 31, 2015, the automatic stay will be modified as to Tennessee State Bank to allow it to foreclose its liens encumbering the Comfort Inn without further notice or hearing.

(2) The Cash Collateral Order entered on June 10, 2014, will remain in effect and the Debtor must continue making the $7,000.00 monthly payment required under paragraph E of that Order.

(3) The Debtor shall continue paying monthly to Tennessee State Bank the $12,805.96 interest-only payments as provided in its Amended Plan of Reorganization. Tennessee State Bank may, at its discretion, direct that these payments be made directly to it or that they continue to be

18

held in escrow by the Debtor's attorneys.  Receipt of these monthly interest payments directly by Tennessee State Bank shall in no way be deemed an acceptance of its treatment under the Amended Plan of Reorganization nor shall it in any way prejudice Tennessee State Bank from voting against the Amended Plan of Reorganization and objecting to confirmation for failure of the Amended Plan of Reorganization to meet the confirmation requirements of 11 U.S.C. § 1129(a) and/or (b) (2006).

(4) The Debtor will provide Tennessee State Bank, through its attorneys or designated representative, copies of all monthly bank statements and rental revenues, together with its monthly operating reports filed with the court by the 15th day of each month.

(5) The Debtor shall immediately apprise Tennessee State Bank of any inspection of the Comfort Inn by the franchisor, Choice Hotels International, Inc., and of any written or oral communication with the franchisor.  Capital improvements to the Comfort Inn shall only be made by the Debtor after notice to Tennessee State Bank and with its approval.  Shelly Spurgeon or her designee shall be the Debtor's contact with Tennessee State Bank.

Notwithstanding the provisions of (1) above, upon motion of Tennessee State Bank certifying that any of the above conditions have not been met or that the value of its collateral has otherwise been placed in jeopardy, and after notice and an expedited hearing, the automatic stay may be modified at any time to allow Tennessee State Bank to foreclose its lien encumbering the Comfort Inn.

### III

With respect to the Amended Fee Application through which the Debtor's attorneys seek payment of their fees, because it is undersecured, Tennessee State Bank asks the court to prohibit

the Debtor's use of cash collateral for payment of those attorneys' fees, arguing that it is not

adequately protected. Cash collateral is governed by 11 U.S.C. § 363, which provides, in material

part:

> "cash collateral" means cash, negotiable instruments, documents of title, securities,
> deposit accounts, or other cash equivalents whenever acquired in which the estate and
> an entity other than the estate have an interest and includes the proceeds, products,
> offspring, rents, or profits of property and the fees, charges, accounts  or other
> payments for the use or occupancy of rooms and other public facilities in hotels,
> motels, or other lodging properties subject to a security interest as provided in section
> 552(b) of this title, whether existing before or after the commencement of a case
> under this title[.]

11 U.S.C. § 363(a) (2006).  Here, there is no dispute that the funds from which the retainer was paid

to the Debtor's attorneys were derived from the operation of the Comfort Inn and are property of the

estate.  There is likewise no dispute that Tennessee State Bank does not consent to the use of its cash

collateral for this purpose.

Courts examining the issue of whether an undersecured creditor's cash collateral may be used

by a Chapter 11 debtor to pay its professional fees have held that "the relevant inquiry is whether

there is adequate protection, not whether the creditor is receiving a quantifiable benefit."   *In re*

*Chatham Parkway Self Storage, LLC*, 2013 WL 1898058, at *4, 2013 Bankr. LEXIS 1955, at *11

(Bankr. S.D. Ga. Apr. 25, 2013) (citing cases).  Additionally, adequate protection as interpreted

under § 362(d)(1) has been defined narrowly by the Supreme Court in *Timbers of Inwood Forest*

*Associates, Limited*; however, adequate protection for the purposes of determining whether a debtor

may use cash collateral is afforded a broader interpretation.

> In order to encourage reorganization, the courts must be flexible in applying the
> adequate protection standard.  This flexibility, however, must not operate to the
> detriment of the secured creditor's interest.  In any given case, the bankruptcy court
> must necessarily (1) establish the value of the secured creditor's interest, (2) identify

the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

*First Sec. Bank & Trust Co. v. Vegt*, 511 B.R. 567, 581 (N.D. Iowa 2014) (quoting *Martin v. United States (In re Martin)*, 761 F.2d 472, 476-77 (8th Cir. 1985)).  In determining whether Tennessee State Bank is adequately protected, the court must determine whether the Debtor's proposed use of cash collateral will impair the value of Tennessee State Bank's interest therein.  *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing H.R. REP. No. 95-595, 95th Cong., 1st Sess. 339 (1977)).  The Debtor, as the party seeking to use cash collateral, bears the burden of proof that Tennessee State Bank's interests are adequately protected. *Chatham Parkway Self Storage, LLC*, 2013 WL 1898058, at *3, 2013 Bankr. LEXIS 1955, at *8.

It is undisputed that Tennessee State Bank is undersecured.  As discussed, its claims total $2,927,076.30, the Blount County Trustee filed a claim in the amount of $113,053.37, and the Debtor owes taxes to the City of Alcoa in the aggregate amount of $98,252.32.  The most recent appraisal for the Comfort Inn was $2,500,000.00, a value substantially less than the claims against the property.  Nevertheless, the Debtor contends that Tennessee State Bank is adequately protected by the following:  (1) the value of the Comfort Inn, which is not declining; (2) the monthly interest payments the Debtor will make to Tennessee State Bank under the Amended Plan of Reorganization; (3) the interest plus principal payments the Debtor will begin making to Tennessee State Bank in October 2015 pursuant to the Amended Plan of Reorganization; (4) the past due property taxes the Debtor will pay which will increase equity in the Comfort Inn; (5) the steps the Debtor has taken post-petition to repair and better maintain the hotel; (6) the reduced expenses and increased

21

efficiency of the Debtor's operations which have increased revenues; and (7) the fact that under the

Amended Plan of Reorganization, Tennessee State Bank will be paid in full by November 2019.

Although each of the foregoing evidence the Debtor's desire to move forward and reorganize,

none constitutes the type of adequate protection contemplated by § 361 which provides, in material

part:

> When adequate protection is required under section . . . 363 . . . of this title of an interest of an entity in property, such adequate protection may be provided by –
>
>> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that . . . use . . . under section 363 of this title . . . results in a decrease in the value of such entity's interest in such property;
>>
>> (2) providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or
>>
>> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.  In fact, there is nothing in the record to establish that the Debtor has offered

Tennessee State Bank any of the adequate protection remedies set forth in § 361, be it a replacement

lien, allowance of an administrative expense, or periodic payments to the extent that the use of

Tennessee State Bank's cash collateral is decreasing.

The cash collateral the Debtor wishes to use is not the Comfort Inn, the value of which was

at issue in making the determination of whether Tennessee State Bank was entitled to stay relief

under § 362(d)(1).  In this context, the cash collateral that the Debtor seeks to use is the revenues

generated from room rentals.  In cases where Debtors have sought to use cash collateral to pay

professional fees, the majority of courts "have deemed a security interest in rents to be wholly separate from a creditor's security interest in property, and therefore, requiring of separate adequate protection." *Chatham Parkway Self Storage, LLC*, 2013 WL 1898058, at *5, 2013 Bankr. LEXIS 1955, at *12-13; *see also Stearns Bldg. v. WHBCF Real Estate (In re Stearns Bldg.)*, 165 F.3d 28, 1998 WL 661071, at *4, 1998 U.S. App. LEXIS 22121, at *12-13 (6th Cir. Sept. 3, 1998) (unpublished table opinion) (holding that "it is clear that Debtor must provide adequate protection if it is to use the net rents. However, the record does not indicate that Debtor possesses any unencumbered assets with which it can offer WHBCF adequate protection. . . . Since Debtor cannot provide adequate protection for the net rents, it follows that Debtor cannot use these rents[.]"); *Putnal v. SunTrust Bank*, 489 B.R. 285, 289 (M.D. Ga. 2013) (holding that the value of the security interest in rents "should be measured by the actual rents that have accrued or will accrue."); *In re Buttermilk Towne Ctr., LLC*, 442 B.R. 558, (B.A.P. 6th Cir. 2010) (holding that "a replacement lien is not adequate protection.").

This case differs from the forgoing because there is nothing in the record to reflect that the Debtor has offered any form of adequate protection to Tennessee State Bank, be it cash payments to offset the amount of net rents that would be due Tennessee State Bank under its security agreement or even a replacement lien in the proceeds. Without providing Tennessee State Bank with any sort of concrete adequate protection, the Debtor is not entitled to use Tennessee State Bank's cash collateral in the form of net rentals for expenses that are not authorized by Tennessee State Bank or the Cash Collateral Order, including payment of professional fees to its attorneys. The court will, therefore, grant the Debtor's Amended First Application for Interim Compensation filed on July 22, 2014, as to the requested $13,185.00 amount – to which no party has objected – but will

23

deny it as to the request that it be paid from the $20,000.00 retainer which represents cash collateral

of Tennessee State Bank.

An Order consistent with this Memorandum will be entered.

FILED:  September 19, 2014

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE