**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

SHIVSHANKAR PARTNERSHIP LLC

Case No.   14-30843

Debtor

**MEMORANDUM ON
SECOND AMENDED PLAN OF REORGANIZATION**

**APPEARANCES**:  TARPY, COX, FLEISHMAN & LEVEILLE, PLLC
  T. Lynn Tarpy, Esq.
  1111 Northshore Drive
  Suite N-290
  Knoxville, Tennessee 37919
  Attorneys for Debtor

  GENTRY, TIPTON & MCLEMORE, PC
  Maurice K. Guinn, Esq.
  Post Office Box 1990
  Knoxville, Tennessee 37901
  Attorneys for Tennessee State Bank

  SAMUEL K. CROCKER, ESQ.
  UNITED STATES TRUSTEE
  Kimberly C. Swafford, Esq.
  Howard H. Baker, Jr. United States Courthouse
  800 Market Street
  Suite 114
  Knoxville, Tennessee  37902
  Attorneys for United States Trustee

**SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE**

Before the court for confirmation is the Plan of Reorganization filed by Debtor on June 26, 2014, as amended on August 29, 2014 (Amended Plan), and as again amended on October 30, 2014 (Second Amended Plan).  Tennessee State Bank and the United States Trustee have objected to confirmation.  The trial to consider confirmation of the Second Amended Plan was held on January 28, 2015.  The record before the court consists of twenty-eight exhibits admitted into evidence, Stipulations filed by Debtor and Tennessee State Bank on January 20, 2015, and the testimony of three witnesses: Anil Merai, Tarun Surti, and Shelley Spurgeon.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

Because Debtor has not met its burden to prove that the Second Amended Plan is feasible, confirmation is denied.

## I.  FACTS

Debtor, which filed the Voluntary Petition commencing its Chapter 11 case on March 17, 2014, operates real property and improvements known as the Comfort Inn located at 140 Cusick Road, Alcoa, Tennessee,[1] as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. The Second Amended Plan proposes the following treatment for six classes of claims and interests to be funded through continued operation of the Comfort Inn, with any shortfall to be funded through additional capital investments by Debtor's equity security holders:

- Class 1 consists of the tax claim of the City of Alcoa in the amount of $90,000.00, to be paid in monthly installments of $2,002.00 plus 12% interest, and the tax claim of Blount County, Tennessee, in the amount of $98,000.00, to be paid in monthly installments of $2,179.96 plus 12% interest.

---

[1] The court will refer to the real and personal property comprising the Comfort Inn collectively as "Comfort Inn."

- Class 2 consists of Tennessee State Bank's secured claim in the amount of $2,927,076.30 plus 5.25% interest, amortized over a 30-year period, to be paid in monthly, interest-only, installments of $12,805.96 from September 1, 2014, through September 1, 2015, increasing to $16,163.42 from October 1, 2015, through September 1, 2019, with the balance to be paid in full on November 1, 2019, through a balloon payment to be funded by a refinance of the Comfort Inn. Tennessee State Bank will retain its lien throughout the life of the plan and will retain all rights under its security agreement with Debtor in the event of default. Debtor's equity security holders (Class 6 claimants) have guaranteed Tennessee State Bank's claim. The parties stipulated at trial that if all payments are timely made under the Second Amended Plan, the balance of Tennessee State Bank's claim to be paid by a balloon payment will be $2,739,882.12.

- Class 3 consists of all unsecured claims of $1,500.00 or less. Debtor will pay these claims in full between March 15 and September 15, 2015.

- Class 4 consists of all unsecured claims of greater than $1,500.00, which will be paid in full, plus 2% interest, through a monthly payment of $793.00 over sixty months, beginning June 1, 2015, to be divided pro rata. These claimants have the option to limit their respective claims to $1,500.00 and be paid as a Class 3 claimant.

- Class 5 consists of the $76,834.13 pre-petition claim of Debtor's franchiser, Choice Hotels International, Inc. (Choice Hotels), which shall be paid in full over twenty-four months beginning December 1, 2014. Under the Second Amended Plan, Debtor will assume its franchise agreement with Choice Hotels.

- Class 6 consists of Debtor's equity security holders, who will retain their interests.

Balloting commenced for the Amended Plan, and Debtor filed a Summary of Ballots on October 14, 2014, evidencing that no ballots were received for Classes 1 and 4, Class 2 rejected,

Class 3 accepted, counsel for Class 5 had advised that it was accepting although no ballot was received, and Class 6, consisting of insiders, did not submit a ballot. As set forth in the Joint Pre-Hearing Statement filed by the parties on January 21, 2015, the confirmation issues to be determined by the court are (1) whether the Second Amended Plan is feasible and not likely to be followed by liquidation or the need for further financial reorganization and (2) whether the Second Amended Plan proposes treatment of Tennessee State Bank's claims that is fair and equitable to Tennessee State Bank.

## II. ANALYSIS

Confirmation of Chapter 11 plans is governed by 11 U.S.C. § 1129, which provides, in material part:

> (a) The court shall confirm a plan only if all of the following requirements are met:
>
> . . . .
>
> > (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.
>
> . . . .
>
> (b)(1) Notwithstanding section 510 of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
>
> > (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
> >
> > > (A) With respect to a class of secured claims, the plan provides –
> > >
> > > > (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such

3

>   > liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>   >
>   > (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; [or]
>   >
>   > . . . .
>   >
>   > (iii) for the realization by such holders of the indubitable equivalent of such claims.

In support of its Second Amended Plan, Debtor presented the testimony of its member Anil Merai and its management consultant and Merai's uncle, Tarun Surti, both of whom testified that Debtor's revenues have increased substantially since it filed for bankruptcy and its new management philosophies under the guidance of Mr. Surti have resulted in improvements to both the physical structure of the Comfort Inn and its day-to-day operations. Each testified that the Second Amended Plan is feasible because, based upon projected gross revenues and the improving economy, Debtor will have sufficient income to make all payments.

In opposition, Tennessee State Bank, through its Senior Vice President/Special Assets Manager Shelley Spurgeon, testified that Debtor's projected numbers are inconsistent and unreliable and, based upon Debtor's own figures prepared by Mr. Surti, Debtor currently does not have sufficient income to fund the Second Amended Plan as proposed. She further testified that she questions Debtor's ability to refinance the proposed balloon payment in November 2019 and that the loan-to-value ratio is 117%, which not only makes it unlikely that a bank would refinance the balloon payment but also violates Debtor's franchise agreement with Choice Hotels. Finally, Ms. Spurgeon testified that the Second Amended Plan was not fair and equitable

because the proposed 5.25% interest rate is insufficient, that Tennessee State Bank is entitled to the 6% contractual rate, and that because the Bank does not offer commercial loans with a 30-year loan amortization, it should not be forced to accept that amortization under the Second Amended Plan.

For the following reasons, although the court rejects the Bank's argument that the Second Amended Plan is not fair and equitable under § 1129(b), the court finds that the Second Amended Plan cannot be confirmed because it is not feasible as required by § 1129(a)(11).

### A. FEASIBILITY

Tennessee State Bank's primary objection to the Second Amended Plan is based upon the feasibility requirement of 11 U.S.C. § 1129(a)(11), which requires the court to find that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." Fundamentally, feasibility "is a factual question since it necessarily depends upon a determination of the reasonable probability of payment," *In re Howard*, 212 B.R. 864, 878 (Bankr. E.D. Tenn. 1997); however, "the plan need only present a 'reasonable assurance of success' by sufficiently establishing 'a realistic and workable framework for reorganization.'" *In re Fairvue Club Props., LLC*, Nos. 309-13807, 310-03566, 309-14911, 2010 WL 4501959, at *3, 2010 Bankr. LEXIS 3888, at *9 (Bankr. M.D. Tenn. Nov. 2, 2010) (quoting *Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs., LLC (In re Brice Rd. Devs., LLC)*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008)).

> The purpose of the feasibility test is "'to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation.' . . . [W]here the financial realities do not support the proposed plan's projections or where proposed assumptions are unreasonable, confirmation of the plan should be denied." *In re Investors Fla. Aggressive Growth Fund, Ltd.,* 168 B.R. 760, 765 (Bankr. N.D.

5

> Fla. 1994) (quoting *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989)); *see In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) (a plan based on impractical or visionary expectations cannot be confirmed). "Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. . . ." *Chase Manhattan Mortg. & Realty Trust v. Bergman (In re Bergman),* 585 F.2d 1171, 1179 (2d Cir. 1978).

*In re 231 Fourth Avenue Lyceum, LLC*, 506 B.R. 196, 202-03 (Bankr. E.D.N.Y. 2014); *see also In re Am. Homepatient, Inc.*, 298 B.R. 152, 169 (Bankr. M.D. Tenn. 2003) ("The proponent of a plan of reorganization does not need to guarantee success, but a court cannot confirm a visionary scheme that promises creditors more than the debtor can possibly attain after confirmation, notwithstanding the proponent's sincerity, honesty and willingness to make a best efforts attempt to perform according to the terms of the plan." (internal quotations and citations omitted)). Debtor must prove by a preponderance of the evidence that its proposed plan is feasible. *See In re RADCO Props., Inc.*, 402 B.R. 666, 678 (Bankr. E.D.N.C. 2009).

In making a feasibility analysis, the court must "scrutinize a debtor's proposed plan payments in light of projected income and expenses in order to determine whether it is likely the debtor will be able to make the payments required by the plan." *Howard*, 212 B.R. at 879-80. Factors relevant to a feasibility determination include: "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *In re Hurricane Memphis, LLC*, 405 B.R. 616, 624-25 (Bankr. W.D. Tenn. 2009) (quoting *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 589 (6th Cir. 1989)). "To provide such reasonable assurance, a plan must provide a realistic and workable framework for reorganization." *Made in* 

6

*Detroit, Inc.*, 299 B.R. 170, 176 (Bankr. E.D. Mich. 2003). "The important consideration is whether, given the debtor's situation, the 'things which are to be done after confirmation *can be done* as a practical matter.'" *In re Om Shivai, Inc.*, 447 B.R. 459, 462 (Bankr. D.S.C. 2011) (citation omitted) (emphasis added).

Debtor bases its feasibility arguments in large part on Trial Exhibit 26, entitled Shivshankar Partnership LLC 2014 Projection (Revised Pro-Forma), which was prepared by Mr. Surti with Mr. Merai's assistance and is a corrected version of the document of the same name attached as Exhibit 4 to Debtor's First Amended Disclosure Statement (D.S. Pro-Forma). Debtor provided the Revised Pro-Forma after Tennessee State Bank noted in its trial brief a number of deficiencies in the D.S. Pro-Forma. The Revised Pro-Forma, summarized below, reflects Debtor's actual operational totals for the Comfort Inn for 2014 (which Mr. Merai testified were obtained from the Choice Hotels revenue report) and Debtor's projections for 2015 through 2019.

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Income |  |  |  |  |  |  |
| Total Room Revenue | $867,192 | $910,551 | $956,079 | $1,003,883 | $1,054,077 | $1,106,781 |
| Total Taxes | $134,800 | $143,412 | $150,582 | $158,112 | $166,017 | $174,318 |
| TOTAL INCOME | $1,001,992 | $1,053,963 | $1,106,661 | $1,161,995 | $1,220,094 | $1,281,099 |
|  |  |  |  |  |  |  |
| COST OF GOODS SOLD: |  |  |  |  |  |  |
| Total Taxes | $134,801 | $143,412 | $150,582 | $158,112 | $166,017 | $174,318 |
| Total Merchant Fees | $151,247 | $148,418 | $155,839 | $163,631 | $171,813 | $180,403 |
| TOTAL COST OF GOODS SOLD | $286,047 | $291,830 | $306,422 | $321,743 | $337,830 | $354,721 |
| GROSS INCOME | $715,945 | $762,133 | $800,240 | $840,252 | $882,264 | $926,378 |
|  |  |  |  |  |  |  |
| EXPENSES: |  |  |  |  |  |  |
| Advertising & Promotion | $3,161 | $3,288 | $3,419 | $3,556 | $3,698 | $3,846 |
| Auto Expense | $1,262 | $1,293 | $1,326 | $1,359 | $1,393 | $1,428 |
| Bank Charges | $368 | $378 | $387 | $397 | $407 | $417 |
| Franchise Fees, Prepetition | - | $38,417 | $35,216 | - | - | - |
| Total Breakfast | $38,888 | $39,860 | $40,856 | $41,878 | $42,925 | $43,998 |
| Total License, Insurance & Permit | $24,391 | $25,001 | $25,626 | $26,266 | $26,923 | $27,596 |
| Interest Expense incl. bank loan | $56,616 | $179,907 | $193,961 | $193,961 | $193,961 | $193,961 |

7

| | | | | | | |
|---|---|---|---|---|---|---|
| Total Repairs & Maintenance | $13,865 | $14,212 | $14,567 | $14,931 | $15,305 | $15,687 |
| Total Supplies | $25,720 | $26,362 | $27,022 | $27,697 | $28,390 | $29,099 |
| Total Salary & Payroll Taxes | $237,017 | $242,942 | $249,016 | $255,241 | $261,622 | $268,163 |
| Anil Merai Compensation | - | - | - | - | - | - |
| Professional Fees | $3,050 | $3,126 | $3,204 | $3,285 | $3,367 | $3,451 |
| Office Expenses | $4,611 | $4,726 | $4,844 | $4,965 | $5,089 | $5,216 |
| Total Property Taxes | $4,181 | $98,428 | $98,428 | $98,428 | $98,428 | $98,428 |
| Telephone Expense | $9,348 | $9,582 | $9,821 | $10,067 | $10,319 | $10,577 |
| Transport and Travel | - | - | - | - | - | - |
| Taxi-Guest | - | - | - | - | - | - |
| Television and Cable | - | - | - | - | - | - |
| Total Utilities | $83,830 | $85,926 | $88,074 | $90,276 | $92,533 | $94,846 |
| Total Monthly Expenses | $506,307 | $773,448 | $795,767 | $772,307 | $784,358 | $796,713 |
| | | | | | | |
| Operating Income | $209,637 | ($11,315) | $4,473 | $67,945 | $97,906 | $129,665 |

[Trial Ex. 26.[2]] Mr. Merai testified that he believes the projections on the Revised Pro-Forma are accurate, that Debtor increased its revenues and reduced its expenses between 2013 and 2014, that its cash flow has increased 29% from 2013 to 2014, and that Debtor has made all payments to Tennessee State Bank and Blount County for taxes as required by the court's September 19, 2014 Order. Similarly, Mr. Surti, who prepared the Revised Pro-Forma, testified the projections were derived from the 2014 actual numbers with a 5% revenue growth and an expense growth between 2.5 and 4% beginning in 2015. When questioned why he chose a 5% revenue growth, Mr. Surti testified that it was not only achievable, but what he deemed a worst case scenario. He also testified that the projections for 2015 reflect a net operating loss because Debtor has between $30,000.00 and $40,000.00 in cash at this time, and approximately $20,000.00 is being held by its counsel in escrow.

---

[2] Mr. Surti testified that he did not differentiate between taxable sales and tax exempt sales for the Revised Pro-Forma, unlike what was done for the D.S. Pro-Forma; accordingly, the court did not include the breakdown in the summary reproduced here.

8

Significant changes were made to the 2014 projected figures first reflected on the D.S. Pro-Forma and those on the Revised Pro-Forma containing the actual figures for 2014.[3] Specifically, the projections versus actual numbers are as follows.

|  | D.S. Pro-Forma Projected | Revised Pro-Forma Actual | Difference |
|---|---|---|---|
| Income |  |  |  |
| Total Room Revenue | $870,165 | $867,192 | ($2,973) |
| Total Taxes | $128,567 | $134,800 | $6,233 |
| TOTAL INCOME | $998,732 | $1,001,992 | $3,260 |
|  |  |  |  |
| COST OF GOODS SOLD: |  |  |  |
| Total Taxes | $127,523 | $134,801 | $7,278 |
| Total Merchant Fees | $141,572 | $151,247 | $9,675 |
| TOTAL COST OF GOODS SOLD | $269,094 | $286,047 | $16,953 |
| GROSS INCOME | $729,638 | $715,945 | ($13,693) |
|  |  |  |  |
| EXPENSES: |  |  |  |
| Advertising & Promotion | $14,967 | $3,161 | ($11,806) |
| Auto Expense | $7,179 | $1,262 | ($5,917) |
| Bank Charges | $300 | $368 | $68 |
| Franchise Fees, Prepetition | $3,201 | - | ($3,201) |
| Total Breakfast | $33,713 | $38,888 | $5,175 |
| Total License, Insurance & Permit | $33,597 | $24,391 | ($9,206) |
| Interest Expense incl. bank loan | $50,750 | $56,616 | $5,866 |
| Total Repairs & Maintenance | $21,874 | $13,865 | ($8,009) |
| Total Supplies | $57,118 | $25,720 | ($31,398) |
| Total Salary & Payroll Taxes | $207,215 | $237,017 | $29,802 |
| Anil Merai Compensation | $48,000 | - | ($48,000) |
| Professional Fees | $10,356 | $3,050 | ($7,306) |
| Office Expenses | $1,200 | $4,611 | $3,411 |
| Total Property Taxes | $71,627 | $4,181 | ($67,446) |
| Telephone Expense | $6,633 | $9,348 | $2,715 |
| Transport and Travel | $1,588 | - | ($1,588) |
| Taxi-Guest | $1,500 | - | ($1,500) |
| Television and Cable | $9,290 | - | ($9,290) |
| Total Utilities | $68,899 | $83,830 | $14,931 |
| Total Monthly Expenses | $649,008 | $506,307 | ($142,701) |
|  |  |  |  |
| Operating Income | $80,630 | $209,637 | $129,007 |

[Coll. Trial Ex. 13 at Ex. 4, Trial Ex. 26.[4]] When questioned about the differences between the projected and actual figures, Mr. Surti testified that he prepared the D.S. Pro-Forma in August or

---

[3] Notably, the D.S. Pro-Forma was served on all creditors, but the Revised Pro-Forma was only submitted as a trial exhibit.

9

September 2014, utilizing some figures from 2013 and some of the numbers available for 2014, but that the Revised Pro-Forma is based on actual 2014 numbers. Debtor's Profit and Loss Statement (2014 P&L Statement) also reflects 2014 figures; however, the 2014 P&L Statement includes the following additional year-end totals:

| | |
|---|---|
| Net Operating Income | $209,637.45 |
| Other Expenses | |
|    Bankruptcy Legal Fees | $21,213.00 |
|    Choice Compliance, Capital Improvement | $56,847.32 |
|    Miscellaneous & one-time expenses | $11,105.41 |
|    Reconciliation Discrepancies | ($0.01) |
| Total Other Expenses | $89,165.72 |
| Net Other Income | ($89,165.72) |
| Net Income | $120,471.73 |

[Trial Ex. 10.] When questioned about the net income reflected in the 2014 P&L Statement, Mr. Surti acknowledged that the expenses include only four payments to Tennessee State Bank and that there is no line item for payment of real property taxes because Debtor did not pay them in 2014.

Simply, Debtor's numbers do not support feasibility. First, the 2014 net income calculations on which the projections for the plan term are based are misleading. The record evidences that 2014 real property taxes owed to Blount County and the City of Alcoa were $24,351.00 and $23,749.66, respectively, and that 2014 personal property taxes to the same entities were $1,613.00 and $1,587.60, respectively, for a total of $51,301.26. [Trial Ex. 28.]

---

[4] Mr. Surti confirmed that the listed expenses for advertising; auto expense; total license, insurance, and permit; total repairs and maintenance; and total supplies decreased, but he did not elaborate on the reasons for the decreases. In response to questions about the categories showing no expenditures, Mr. Surti testified that since Debtor did not incur any expenses for taxi and travel in 2014, none were included in the Revised Pro-Forma, and any such expenses that would be incurred in future years would be absorbed within the cost of goods sold. Concerning the increase in the payroll line item and the failure to list any compensation in the Revised Pro-Forma under the line item for Mr. Merai, Mr. Surti testified that he included Mr. Merai's $49,920.00 annual compensation in the total payroll expense on the Revised Pro-Forma while reducing other operational payroll expenses for Debtor. Finally, Mr. Surti testified that he included the television and cable expense with total utilities on the Revised Pro-Forma.

The Second Amended Plan provides payments to those taxing authorities for past due taxes which, without calculating interest, will be $50,183.52 annually. Assuming the amounts for real and personal property taxes remain constant for the duration of its plan, Debtor will be responsible for a combined minimum annual payment of $101,484.78 to Blount County and the City of Alcoa, an amount that was not included in the Revised Pro-Forma's actual numbers for 2014 or in the 2014 P&L Statement. Deducting that amount from Debtor's $120,471.73 net income for 2014 yields $18,986.95. The net income for 2014 also includes only four, interest-only payments (of $12,805.96 each) totaling $51,223.84 to Tennessee State Bank following entry of the court's September 19, 2014 Order. The remaining eight payments totaling $102,447.68 that Debtor would have paid to Tennessee State Bank for January through August are not included in the Revised Pro-Forma. The result is that the Revised Pro-Forma fails to include annual expenses totaling $203,932.46 (i.e., $101,484.78 (for taxes) plus $102,447.68 (for interest payments to Tennessee State Bank)). Had Debtor paid such expenses in 2014, net income would have been <$83,460.73>.

Second, Debtor's projections omit what appear to be necessary ongoing expenses. Mr. Surti testified that the projections in the Revised Pro-Forma reflect decreases in future expenses for a number of areas, including supplies, utilities, payroll, advertising and marketing, and repairs and maintenance. At the same time, Mr. Surti testified that both advertising and maintenance are important areas in which Debtor must excel in order to increase revenues and that he had calculated a 4% increase in advertising expenses in the D.S. Pro-Forma because he wants to expand Debtor's marketing strategy. This testimony is contradicted by the obvious decrease in the projected advertising budget from $14,967.00 reflected in the D.S. Pro-Forma to the projected 2015 advertising budget of $3,288.00 in the Revised Pro-Forma – a reduction of

11

$11,679.00 (more than 22%). Similarly, the Revised Pro-Forma and projections do not include a line item for capital improvements even though, according to Mr. Surti, the carpet still needs replacing and, as reflected in the 2014 P&L Statement, Debtor spent more than $56,000.00 on such improvements in 2014. Mr. Merai agreed that additional capital improvements are needed, such as changing out the carpet and faucets and updating the exercise room, for which Debtor intends to lease exercise equipment, although the Revised Pro-Forma does not include any lease payments. He also admitted that even with the more than $56,000.00 in improvements made in 2014, the swimming pool door has not been fixed and the carpet has been cleaned only, not replaced. The court finds unpersuasive Mr. Merai's testimony that Debtor did not include a line item for capital improvements in the Revised Pro-Forma because such improvements will be made only with approval from Tennessee State Bank and as revenues allow. Without a line item for capital improvements in the projections – when such improvements are not only contemplated but most likely will be required for compliance with Choice Hotels at some point between 2015 and 2019 – all the remaining numbers are skewed and unreliable. Likewise, underestimating the expenses on the Revised Pro-Forma for advertising and marketing, supplies, and repairs and maintenance renders the projections unreliable.

Third, Debtor's projections do not account for continuing franchise fees or for certain plan payments. The Revised Pro-Forma provides for Choice Hotel's pre-petition claim in the amount of $76,834.13 for delinquent franchise fees. It does not, however, include a line-item for ongoing franchise fees payable to Choice Hotels during the plan term, nor does it include a line item for payment to Class 4 creditors holding unsecured claims in excess of $1,500.00 (which will be paid $793.00 for 60 months) or a line item for payment of Class 3 creditors holding unsecured claims of $1,500.00 or less (which will receive payment in full from March 15, 2015,

12

through September 15, 2015). Mr. Surti testified that the payments are included "somewhere" within the Revised Pro-Forma, but he could not identify where. Such is fatal to feasibility.[5] The court also notes that the Revised Pro-Forma provides for payment of $98,428.00 for "Total Property Taxes"; however, that amount is insufficient to pay the proposed annual plan payment of $50,183.52, plus interest and ongoing real and personal property taxes totaling $51,301.26. Failure to include basic fees and expenses that Debtor is required to pay – and has been negligent in paying in the past, resulting in pre-petition claims for Choice Hotels and taxing authorities – weighs against feasibility and does not provide the court with an assurance of Debtor's ability to make those payments timely for the duration of the Second Amended Plan.

Finally, the court finds that Debtor failed to prove by a preponderance of the evidence that it can obtain the necessary funds to make the proposed balloon payment. The most recent appraisal, dated September 5, 2014, assigns a value of $2,500,000 and describes the property as follows:

> Interior inspections were made of rooms 201 (king), 307 (king with Jacuzzi) and 321 (double queen). Each room is equipped with bedding, nightstand(s), table and chairs, sofa, dresser, mini-fridge, microwave and television. According to the owner, the bed linens were recently replaced.
>
> The building accommodates 59 hotel rooms, lobby, breakfast room, enclosed pool, fitness room and laundry. Twenty-nine of the 59 rooms are standard double queen rooms and the remaining 30 rooms are king with 5 of those being suites.
>
> Summary
>
> The overall condition of Comfort Suites is average. Interior décor is typical for this property type; however, it appears to need updating (e.g., new

---

[5] The Revised Pro-Forma also does not include a line item for the quarterly fees to be paid to the United States Trustee; however, Mr. Surti and Mr. Merai testified that Debtor does not pay those fees from its revenues. Instead, they are paid by Debtor's members. The court finds this somewhat troubling, however, in light of Mr. Merai's testimony that the fees paid to the United States Trustee for the last quarter in 2014 were more than $4,000.00 and his sole source of compensation is the $49,920.00 he receives from Debtor.

13

>  paint, carpet, light fixtures, etc.).  Exterior of the building appears to have been recently painted.
>
>  Lobby area provides reception/welcome space with breakfast area.  In-ground pool is enclosed with concrete perimeter decking.

[Trial Ex. 17 at p. 24.]  As reflected in the Second Amended Plan, the secured claim payable to Tennessee State Bank, secured by the real and personal property comprising Comfort Inn, is $2,927,076.30, of which approximately $121,000.00 was loaned to Debtor to avoid delinquent property tax sales in 2012 and 2013.  The $427,076.30 loan-to-value deficiency also does not include the $188,000.00 aggregate, past-due real and personal property taxes owed to Blount County and the City of Alcoa.  Debtor has a history of not making its property tax payments, in particular, and the fact that the amount of the combined, secured debt is over $600,000.00 more than the value of the Comfort Inn leads the court to discount the assertions of Mr. Merai and Mr. Surti that Debtor can refinance the end-of-plan balance of approximately $2,739,882.12.  Their opinions alone are insufficient to provide the court and Tennessee State Bank with a reasonable assurance that a refinance can, in fact, be achieved. *See, e.g., In re Sparkle Stor-All Eaton Township*, No. 11-30382, 2011 WL 4542709, at *6, 2011 Bankr. LEXIS 3767, at *18-19 (Bankr. N.D. Ohio Sept. 28, 2011) ("Counsel said that Debtors intended through their plan to pay off in a balloon payment both the present value of the Bank's collateral and the Bank's total secured claims after five years and that the means for making the balloon payment would be either through refinancing the Bank's debt or sale of the facilities. . . .  [N]o evidence was presented by Debtors at the hearing to support even arguably the feasibility of this proposal.  *Such balloon payment proposals generally raise court scrutiny and skepticism that such a plan merely allows debtors to postpone the inevitable and gamble creditors' collateral on a long-shot improvement in*, in this instance, *the value* of the storage facilities." (emphasis added)); *In re Trento Ridge*

14

*Investors, LLC*, 461 B.R. 440, 494 (Bankr. S.D. Ohio 2011) (holding that in light of the fact that the only evidence presented regarding the debtor's ability to make the balloon payment were conclusory statements by its co-manager that she "did not see any significant obstacle to a refinancing" without tendering evidence of the remaining economic life of the collateral, the court "cannot simply assume that the value of the Trenton Ridge Apartments 30 years from now will continue to be the current value, or anywhere close to it"). The court rejects Mr. Surti's testimony that he believes Debtor can make the balloon payment that will be more than the current value of the Comfort Inn because the appraisal was based on profit and Debtor's profits are projected to increase under the Revised Pro-Forma, which the court has determined is not reliable. Additionally, Mr. Surti's testimony that he has been involved in obtaining secured commercial real estate loans in the past and has begun to explore refinancing options for Debtor was not supported by any documentary proof; in fact, Mr. Surti could not provide the name of the bank with which he had been inquiring about such refinancing.

Also relevant to this analysis is the fact that Debtor consistently has been in violation of Section 19 of the Comfort Inn Franchise Agreement with Choice Hotels: "Franchisee shall promptly pay when due all taxes levied or assessed by any federal, state, or local tax authority, and any and all other indebtedness incurred by Franchisee in the operation of the Hotel." [Trial Ex. 18 at p. 12.] The court also finds it germane that Mr. Merai expressly testified that if Debtor cannot refinance the balloon payment, none of its members would be able to do so.

Because Debtor's figures do not support a finding that the Second Amended Plan can be funded as proposed and is not likely to be followed by liquidation or the need for additional financial restructuring, confirmation will be denied based upon feasibility.

## B. FAIR AND EQUITABLE

Tennessee State Bank also argued that the Second Amended Plan is not fair and equitable under § 1129(b) because it proposes a 5.25% interest rate rather than the 6% contract rate and provides for a 30-year amortization, which is not the type of loan terms offered to the Bank's commercial borrowers. "The fact that a secured creditor's loan repayment term is extended beyond contract limits does not automatically breach the 'fair and equitable' requirement for cramdown of a secured claim under § 1129(b)(2)(A), so long as the secured creditor's claim is adequately protected . . . , [and] a plan proposal to extend a matured, short-term loan over a substantially longer term is subject to particularly close scrutiny[.]" *In re Orchards Village Invs., LLC*, No. 09-30893, 2010 WL 143706, at *20, 2010 Bankr. LEXIS 48, at *57-59 (Bankr. D. Or. Jan. 8, 2010).

Based upon the record before it, the court finds that the Second Amended Plan is not unfair and inequitable per se. As argued by Debtor, the 5.25% interest rate, which is only .75% lower than the contract rate, is commiserate with *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), and, in fact, provides Tennessee State Bank with a 2% risk adjustment over prime. The Second Amended Plan provides that Tennessee State Bank will retain its lien and, in the event of default, its rights to foreclose. Although the Second Amended Plan proposes a 30-year amortization of Tennessee State Bank's claim, it does not propose payment over thirty years, but by November 1, 2019. Debtor's proposed treatment of Tennessee State Bank's claim is not unfair and inequitable, and its objection to confirmation on that basis shall be overruled.

## III. CONCLUSION

Debtor's Second Amended Plan filed on October 30, 2014, is not feasible and cannot be confirmed as proposed. The Objections to Confirmation filed by Tennessee State Bank and the

16

United States Trustee shall be sustained, and confirmation shall be denied.  Debtor may, however, further amend its plan to attempt to cure the feasibility issues.  The court's September 19, 2014 Order requires Debtor to obtain confirmation no later than March 31, 2015, or the automatic stay will be modified without further notice or hearing as to Tennessee State Bank, allowing it to foreclose its liens encumbering the real and personal property comprising the Comfort Inn.  Due to unforeseen events beyond the court's control, including its closure for inclement weather several times during February 2015, the court will extend the time for obtaining confirmation of an amended plan to April 30, 2015.  Any amended plan shall be filed no later than March 20, 2015.  An order consistent with this Memorandum shall be entered.

FILED:  March 6, 2015

                              BY THE COURT

                              */s/ Suzanne H. Bauknight*

                              SUZANNE H. BAUKNIGHT
                              UNITED STATES BANKRUPTCY JUDGE